The United States Court of Appeals for the Federal Circuit is now open and in session. The United States and its Honorable Court. Good morning, everyone. The panel has before it six cases, four of which are being argued. The two cases being submitted today on the briefs are in Appeal No. 05-3354, Guyette v. Office of Personnel Management, and Appeal No. 06-3092, Nixon v. Office of Personnel Management. The first case being argued is in Appeal No. 05-3291, Eldredge v. Interior. Mr. James, welcome. Good morning. Please proceed. May it please the Court, it may be best to touch on a couple of things that aren't in dispute in this appeal. Brian Eldredge, the petitioner, has been employed by the Bureau of Land Management of the Department of Interior since 1977 in the firefighting line of work. It has been continual but not continuous. I would have thought you would want to concentrate on precisely the points of disagreement, not the things that are not disputed. That's fair. Maybe you could start out by giving us a little context because it seems a little odd that somebody with a career appointment would take two temporary appointments. It's a little hard, I think, for us to understand what the purpose of that is and why that happens. I'd be happy to do that. Mr. Eldredge's affidavit appears in the record, and it sets out the history of disagreement between he and his manager in California, which caused him to perceive it was best for him to move to another manager in another area of work. To accomplish that, he began to apply for various positions around the country. This was a position offered to him, and he took it. That's the circumstance. In order to transfer, he might have to take a temporary position. That was exactly what happened. In fact, he did take the temporary position in 1991, which, as the Court appreciates, was terminated before the end of the term, but then he was called back and it was terminated a second time. So it was terminated both in September of 1991 and, again, the second appointment in early November of 1991. Now, you don't contest the lawfulness of the OPM regulation, do you? No, sir, I do not. So it's just then a question of whether the OPM opinion letter correctly interpreted that OPM promulgated regulation. That's right. And if I may? Go ahead. That regulation points us to, of course, the discontinued service statute for the definition of other than a termination involuntary. And by that, I mean simply that OPM's regulation leads to the notion that a disqualifying involuntary termination is one where the employee is accused and presumptively proven to have been engaged in misconduct or delinquency. So you would say, then, that the OPM interpretation of Part 3 of its regulation conflicts with the statute to which the regulation explicitly refers. I would. And, therefore, it can't be a proper interpretation. That's right. Does that matter? It does. In the sense that she agrees that it was a termination involuntary and seeks to carve out a new rule that says involuntary terminations are exactly what they say, except when there is a termination involuntary. Well, you're not making a disparate treatment argument, are you? No. It's a one-off analysis. I've never seen this issue raised in two decades of doing this sort of work. Do you know the history of this? As I understand it, by the mid-'90s, the agency had revised the personnel records to find your client qualified to amass credits toward the firefighter retirement. And then about eight years later, and as far as I could tell from the briefs, out of the blue, the agency second-guessed itself and then sought this what I'm calling an advisory opinion from Ms. Wilson at OPM. Can you enlighten us as to what led to this change of mind eight years later? No. I view it the same way you do, Your Honor. Does it matter that they made one decision in 1995 and a different decision eight years later? Well, it does insofar as the retroactivity creates two sorts of problems. Well, but it's just retroactivity of an interpretation. Interpretations are always retroactive. It's not as though they've adopted a new regulation, which might have a retroactivity problem. Is this a common problem that we're facing here today? As I say, I've not seen a problem of this sort, but it's at risk, I suppose, in every case. You said that you hadn't seen it litigated before, but I was wondering whether there were cases backed up now that presented this issue. No. Not to my knowledge. No. Can you help explain what the logic is of interpreting permissible breaks in service from impermissible breaks in service in this kind of a case involving a law enforcement officer or a firefighter? I'd be happy to. The nature of the work, particularly in the area of firefighting, is generally seasonal at the first level, at the hands-on, on-the-ground level. That is to say there are fire seasons that sort of migrate across the country from Florida on through to California. And you have typically young, healthy, first-line firefighters who come on oftentimes after the school year finishes and leave as the next school year begins. Are they given temporary appointments each year? Yes, uniformly. Well, what's the difference between the temporary appointments your client had in the 70s and 80s when he was a primary firefighter and the temporary appointments he had in 1991 when he was in the secondary status, other than the difference in status? Associated with those temporary appointments, once one performs successfully, is a right to rehire, to be called back on an expedited process because the employing agency has obviously determined that this is someone we want to come back. So that's difference number one. And, in fact, that's what happened in 1991 after the first temporary appointment at the fire center. Excuse me, after the second one. I apologize. It was in late November of 1991 that Mr. Eldridge received a letter, again, it's in the appendix, saying you're entitled to this rehire process. If he had quit, as the agency would logically conclude, he would not receive such a letter. But by being terminated involuntarily, essentially laid off, that's part of the mechanism, as I understand it, that precipitates the offer of rehire on an expedited basis the following year. Could I ask you a hypothetical? Suppose someone in his position is within a year of being able to get this early retirement. And he really would like to go into the private sector and do that for 10 years, but he wants to preserve the opportunity to come back briefly to get his early retirement credit for federal purposes at some later date. So he manipulates things so that he moves to a temporary appointment, the way your client did, and is terminated from that. Can that person come back 10 years later and earn the rest of the credit under your interpretation of the statute? Yes. Yes. Yes. In fact, I've been involved in a case where that was exactly what happened, is an employee was laid off due to base closings prior to having attained the age requirement. He came back to federal government, attained the age requirement, and was allowed to retire. Yeah, but my hypothetical has an ingredient in it which you're not addressing, and that is that this is a deliberate manipulation of the system. And the reason I ask about this is that I've read the entire section of the handbook, which unfortunately is not cited in the party's briefs. And the handbook seems to be very concerned with this possible manipulation of the system by taking a temporary appointment and having it terminate early as a way of getting retirement to which the employee wouldn't otherwise be entitled. But what I'm asking you, if there were evidence here that the system were being manipulated by the employee who takes a temporary, instead of doing it at the request of the agency or whatever, he's manipulating it in order to preserve his retirement rights so he can come back 10, 15 years later, earn the extra year, and get the retirement. Would that be covered by your theory? It would, and it would for this reason. The OPM regulation points to the answer. It says misconduct or delinquency abrogates the involuntary termination that would have precipitated—it's in your hypothetical. So in other words, perhaps it's fact-driven, but the bottom line is there is a safeguard. Well, that's not misconduct to adjust your employment situation to get a retirement. That's not misconduct, is it? Well, two things. Number one, I took the term manipulate to be a negative and adverse conduct on the part of the employee. Perhaps I should have. The other thing, though, is it may well be, in the context of manipulating the system for an improper purpose, either misconduct or delinquency. That's a separate question, of course, but that, I think, is the answer. That test is in place. You don't need to create a new rule. Mr. James, did you research the promulgation of this regulation by OPM? I take it it was put out for notice and comment, and there was a draft version and a final promulgated version. Did you research that to see what the purpose of this was? Certainly, and that had, in fact, been one of the comments I intended to share this morning, and that was one of the purposes, setting aside having a young and vigorous workforce and so on, is that this line of work, the firefighting line of work and the associated law enforcement line of work, be a career, a federal career path. Yes, but I'm referring to Part 3 of the regulation that talks about permissible breaks in service and impermissible breaks in service for purposes of retirement coverage, and I'm trying to understand what was OPM trying to accomplish? The face of the reg gives me no clue at all, so I'm asking if you know from having researched the history of the promulgation what the purpose was, what was the problem they were trying to solve? We found nothing, Your Honor. And it was for that purpose that, frankly, I sought out the deposition of Ms. Wilson to determine, if possible, what it was that OPM was trying to do. But the history does emphasize the importance of continuity of service. It does, certainly, and that's the career function of this retirement benefit. So it's difficult to believe that this reference in the subsection we're talking about was designed to enable people to get this benefit with a substantial break in service. That would certainly follow. Wouldn't it be within the authority of OPM as the promulgator of the regulation to make a determination based on management, personnel management policies, I suppose, of what the permissible length of a break in service would be? And they did that, and they said three days. That's not outside of – that's not ultra-virus, is it? That's not unlawful. Now, it may be that they could have said and maybe one could say should have said one year, but that doesn't make it unlawful for them to say three days is the maximum permissible break in service. No, and I think that's tempered by the involuntary termination language setting aside the three-day rule in cases such as this and certainly in cases where we're reaching back into the middle of someone's career. Do you maintain that we have some sort of equity-based power to direct relief for your client on the grounds that he's lost 16 years, if I did the math right, of credit under the circumstances you've already outlined here and in your brief? Because if so, I don't know what the basis of that would be. The reg says what it says. If it's not unlawful on its face, then other than having arguments and disagreements about the proper interpretation and whether Mr. Wilson's interpretation was lawful or not, it seems to me you can't get any mileage out of the otherwise powerful fact that we have 16 years of credits of a guy who in effect has been a lifetime firefighter. But I don't see that we have any authority to do anything with that otherwise impressive fact of 16 years of secondary firefighting. Certainly, and the Richmond decision is obviously implicated in that, well, in your question and in the answer. And as you know from the briefing, it's our position that Richmond is not an absolute bar to equitable relief in matters of this sort. Well, I'm not asking whether there's a bar. I'm asking whether there's any authority that would support an equitable-based determination by this court. It seems that a legal determination has that effect. I'm not aware of independent equitable authority, no. All right, well, we'll hear from the government and we'll give you a couple of minutes, even though your time has expired, for a rebuttal. Thank you. Mr. Mikkel, am I pronouncing your name correctly? Yes, Your Honor. Very good. Welcome. Good morning. Good morning, Your Honor. Perhaps you could give us your answer to any of the questions we already asked opposing counsel, if you have further information than he. I don't have further information as far as the purpose of the regulations, Your Honor. In researching and preparing for drafting the brief in response, I consulted with OPN. And they provided they did not have any legislative history or any more guidance for me, except the fact that they adopted the three-day rule. We have a bit of a problem here in the sense that there's a question as to which standard we ought to apply to this handbook. If the handbook's interpreting a regulation, as I understand Cleveland Baseball and the Supreme Court and our decision, American Express, it would be pertinent to look to the handbook to interpret the regulation. But a handbook wouldn't be entitled to Chevron deference if we were interpreting a statute. And it would seem as though since the regulation here does no more than incorporate the statute, that we're really dealing with a situation in which we're interpreting the statute. We have to find a source which would be entitled to Chevron deference, and the handbook doesn't qualify for Chevron deference. What's your comment on that? We would agree. And I think the case law of the court supports the idea that not only this regulation, primarily the regulations that would support OPN as well as the AJ's decision that they look to for guidance as to how to define involuntarily certainly the Federal Personnel Manual as well as the CSRS and the FEERS handbook would not be entitled to Chevron deference. Is your answer to Judge Dyke's question that the standard of review applicable here is de novo? Well, yes, Your Honor, and that's what we pointed out in our briefs. Well, you also argued that we have to defer to OPM's interpretation of its own reg, which seems entirely inconsistent with the idea of de novo. Well, we said, Your Honor, that on citing the Solicis, as long as there is a reasonable, the language that I think we would present, it was reasonable and consistent with the statute. And that's the traditional deference that this court instructed in the Roman v. Central Intelligence case. I'm confused. I thought you agreed that the handbook wasn't entitled to Chevron deference and that essentially we're interpreting this statute here. That's right. Right? So where do we go? How do we figure out what the statute means in this context? Well, I think the court should grant as long as OPM's interpretation was reasonable and not inconsistent with the statute, OPM is responsible for… Now it sounds like you're saying we have to defer again because those people over at OPM are experts in personnel matters. I think you've got to make up your mind here. Well, Chevron deference would apply to the regulation. There's really no regulation that this is a decision by OPM. But in this case, though, we believe the deference… Deference to what? Their decision or their reg or their interpretation of their reg? Exactly what is it that we have to give what level of deference to? Well, in this case, it's clearly not the regulation because it wasn't promulgated in the force and effect of law. But there should be, in those cases where there is not a definition in the statute but there are other definitions that certainly don't have the force and effect of law but are used by OPM as guidance when coming up with a decision in the case. As long as those statutes are not… As long as those decisions are not inconsistent with statute, we would argue that there should be some deference. I mean, doesn't… The Nevlin case certainly discusses that when it was looking at this statute, of course, under the CSRS. So your answer is that we have to defer to Ms. Wilson's interpretation of the OPM reg at the level of some deference? Some deference, yes, Your Honor. Let me ask you, if I could, please. Ms. Wilson says, and this is at page 33 of the joint appendix, she determines that this was not an involuntary termination, namely the departure, I guess, in October of 1991, because when Mr. Eldridge came on board and took this position in… originally in April of 1991, he knew that it was just a temporary position, right? That's a decision of… Yes, Your Honor. So that's what she's saying. I mean, she's pinning the issue of voluntariness or involuntariness on the knowledge of the employee at the time he took the position, okay? Now, she doesn't cite anything for that. She may be right, she may be wrong, but she doesn't cite anything for that. But what is the authority for the approach that she took in that… in doing that? Because she doesn't cite any authority for that proposition in her opinion. That's correct. It may be a logical approach, it may not be, but she doesn't cite any authority for it. What is the authority for it? Because if you look at the handbook and some of the other documents, they all seem to pitch the issue of voluntariness or involuntariness on what caused you to leave, not what you knew when you started. She doesn't… you're correct, Your Honor, she does not cite her source for that decision. Well, then is there a source? She doesn't cite it. We believe there is not a… the Federal Personnel Manual that was effected in 81 as well as the CSRS and the Fears Handbook clearly is a source that provides guidance. No question, but what is it in those documents that supports her, you know, hanging her hat on what he knew when he entered the position? A couple of things, Your Honor, and I point you to 74 in the appendix where we set forth, for instance, the Federal Personnel Manual. The first thing it says is on S11-2A, the term involuntary separation means any separation against the will and without the consent of the employee. The argument of the government is, or the contention of the government is, is that when an individual agrees to a term of employment at the beginning, they are automatically consenting to the fact that they will be terminated at the end of that short-term employment. Moreover, also in that Federal Personnel Manual it says whether a separation is… Well, why shouldn't it be interpreted to refer to people who quit? Not people who are separated at the will of the agency for its convenience, but people who quit because they get tired of being a secondary firefighter and they want to go be a portrait painter. Well, it wouldn't in that case because that was voluntary, Your Honor. Yeah, that's my point. That would be one definition of voluntary which would make a lot of sense to me. It doesn't make quite so much sense to me to define a voluntary to mean, as Judge Shaw aptly points out, he knew when he took the temporary appointment that because it was temporary, it had a finite end. And therefore he, quote, consented, and therefore it wasn't involuntary because he consented by taking it in the first place. But I think, Your Honor, both parties agree that the definition of involuntary should be with, you know, was it against the will of the individual and without that individual's consent. I mean, in his reply brief at page 9, a petitioner agrees to that definition. But there's also more in the Federal Personnel Manual. They also say you need to look at all the facts, totality of circumstances, and once again, note too, Your Honor, in… The Federal Personnel Manual or the handbook that's the current version, and I read the section here, is dealing with the concern about manipulation of the system so that people can get this early out when they really weren't involuntarily separated from the Federal Service. They take a temporary appointment with the idea that that will bring them under the retirement system when they otherwise wouldn't be. We're not dealing with that kind of situation here where there was some manipulation of the system by the employee, are we? No, Your Honor. I don't think there's any evidence in the record. But the Federal Personnel Manual does say, and it's at 76 in the record at 11-2k, that, two, that an employee who voluntarily leaves a regular employment to accept a short-duration appointment with full knowledge of its early termination will not be viewed as involuntarily separated. Yeah, yeah, but it's more complicated than that. You haven't cited the rest of the manual. The manual, as I read it, or the handbook, as I read it, is concerned with manipulation of the system. It says, for example, if the employee takes a temporary appointment because the agency requests him to do it, that that doesn't make it outside the involuntariness rule. I mean, there are a number of exceptions. It's not quite so simple as the general rule that you quote there. And as I read the handbook, and tell me if I'm wrong about this, it's dealing—it's trying to deal with the situation in which people use these temporary appointments to get retirement benefits that they otherwise wouldn't be entitled to. Am I wrong about that? We disagree with the court, no, Your Honor. Okay, but that's not the situation we're dealing here with this employee. There's no suggestion that he was manipulating the system. That's right, Your Honor. But there's also—back in 91, there's also, looking at the SF-50s in the document of the record, there's also no—they're really—the government intended—there was also no suggestion that he knew when he left his primary firefighter position in California to come to Idaho to work in a temporary appointment that that, in fact, would lead to a 20-year career. I mean, especially if we look at the SF-50s that are in the record, like for on 21, when he was appointed that second time to the limited 30-day appointment, what's noticeable in that form, though, is when you look at Block 30, the retirement plan, it no longer instructs that employee that he was under the FEERS FICA special retirement plan as was demonstrated in the prior SF-50. It shows that he was under the FICA social security system, meaning he wasn't paying into the system at that time. And there's no language, certainly no language, in the remarks section of 45 of that SF-50 that are similar to the remarks section in the prior appointment that would even give any credence to the idea that he thought that when he was terminated that he was going to continue on next summer. The letter that Mr. James refers to does say that you are eligible to rehire, but it certainly doesn't guarantee employment. And, in fact, it tells you that you're only eligible for four rehires. So at that time, Mr. Eldridge only knew that, at best, he could be rehired four times. When he was rehired in 92, that wasn't to a temporary position. It was to a competitive position that he had a competing for. Has there any consideration been given to redrafting this regulation to make it clearer? My discussion with OPM on that subject did not come up. Mr. Mickel, I still don't feel very satisfied by your attempt to answer Judge Schall's question about why the government, with a regulation that seems to talk about its reason for separating an employee, suddenly shifts to his state of mind. It's kind of switching whose perspective you look at. The regulation seems to say you look at the agency's reason for instituting the separation, and then suddenly Ms. Wilson is saying, no, no, you look at the employee's state of mind, what he knew or should have known or should have expected. What justifies that switch in perspective? I don't know if it's a switch in perspective, Your Honor, because the regulation does say you have to look at the totality of the circumstances. And I read the regulation, or the government reads the regulation, Your Honor, primarily to say— The regulation doesn't say totality of the circumstances. I apologize, Your Honor, the personnel manual. And that is, those instances where they specifically list out some examples of what is involuntary, in all cases, those are when the government takes a unilateral action. Well, they did have lack of funds here. We do have a lack of funds, but in the personnel manual, though, that lack of funds, we interpret that to be when you're in an agency and all of a sudden the agency, for some reason, has their funds frozen by hires and they no longer can— Here's a permanent state of affairs. You admitted it yourself. It's too expensive to keep all these firefighters, primary and secondary, on the payroll year-round. So the Interior Department and the other agencies that employ firefighters make it seasonal, and they hire and release and hire and release these guys, so they, in effect, work six months a year, roughly speaking. Well, my conversations with the Bureau of Land Management, when they hire firefighters who do firefighting duty, not the secondary duty, many firefighters are hired as career firefighters who then take leave without pay. They're not temporary appointments. While they might have a temporary duration of duty, they're actually on the rolls, paying to the retirement system, and in this case, when he was on his second temporary appointment, the petitioner did not pay into the retirement system. The manual provisions that you rely on are from what, Chapter 44? The manual provisions that the A.J. relied on, Your Honor, yes, were Chapter 44B. Now, isn't Chapter 44 dealing with discontinued service annuities? Yes, Your Honor. Isn't that a completely different type of annuity than a firefighter annuity? Yes, Your Honor. Isn't the firefighter annuity Chapter, actually, Chapter 46? Yes, Your Honor. Well, is it cricket to rely on a different chapter involving a different kind of annuity to interpret what should happen for a firefighter annuity? In this case, Your Honor, there was no definition in the firefighter annuity, and when the A.J. made that comment, I believe he was responding to a point raised by Petitioner's Counsel. So he looked at the further, he, the, struggling with some of these. Petitioner suggested it. In the end, Judge Cassidy relied heavily on Chapter 44, even though the type of annuity in issue is covered by Chapter 46. To try to figure out how to define involuntarily. Well, I understand that, but it still seems a little questionable to me to shift to a different kind of annuity, a different chapter of the handbook, and, oh, how convenient. Now we have an excuse to save some money. But the government has defined involuntarily one place, and when they have to look for another definition where it hasn't been defined, it's reasonable for OPM to look at that regulation. Well, what you're saying is that the regulation here adopted this other unrelated statutory provision as the test. And it seems to be quite anomalous, as Chief Judge Mischel is suggesting, that the regulation adopted this other test from this other part of the statute. But that's what they did. And I guess you're saying that if somebody were riffed and came back ten years later, he could still be given credit for continuous service. He wouldn't have the break of service disqualification that we're talking about here, right? It's only when they, when they, that would be the position. So he could take a ten year break. If he were riffed, he could take a ten year break and come back, and there wouldn't be any problem with continuity of service. Because that break would be defined as involuntary. And that specifically is mentioned in that part of Chapter 4. Shouldn't the definition used, adopted by OPM, have to have some reasonable foundation? Well, yes, Your Honor. But in this case, the definition, they did say against the will and without the consent of the employee. Mr. McGill, one question if I could, if I could answer. The, we've looked at the decision of the OPM, of Ms. Williams of OPM. And I realize that this is not, we're not interpreting, we're not judging her interpretation of a statute. We're judging her interpretation of a regulation. Do we engage in a process analogous to Chevron or Skidmore? Realizing that this is not a statutory thing. This is about, Your Honor, we would say it's more analogous to Skidmore deference. So we, you think we would apply a Skidmore approach to judging her assessment of the rate? Yes. Thank you. Doesn't Skidmore say that the reasoning set forth by the deciding person tells you what level of deference, if any, you afford as a court, based on the quality of that reasoning? And here, I don't see that we really have any reasoning by Ms. Wilson. We just have a conclusory statement. There's no reasoning behind it, much less any authority cited for it. Is there? Ms. Wilson's statement in the record, as set forth in the record of the depositions, demonstrates that she primarily looked at the totality of the circumstances. Yes, Your Honor, you're correct. Now, can you enlighten us about why the Interior Department, for something like eight years, considered this man and told this man that he was in the firefighter retirement system, and then another eight years later suddenly changed its mind and sought an opinion from OPM? How did that all come about? Well, I'm past my time, Your Honor. Obviously, the decision here, there's a history. Initially, when he was appointed in 1992, he was not covered under the FEERS special retirement. And it's 21, on page 21 of the record. I want you to answer my question. Once they said he was under this system, they kept him under the system, by my recollection, for about eight years. And then seemingly out of the blue, they said, ah, we've been wrong for the last eight years. My question to you is, how did it come about that after eight years of classifying him in the system, suddenly they changed their mind? I can tell you that, Your Honor. The Bureau of Land Management initially monitored and determined who was entitled to secondary coverage. Sometime in the 88, 89 timeframe, Interior decided because that each individual agency, like Fish and Wild Hive, Park Service, Bureau of Land Management, were all making their individual decisions, it would be conducive to the Department of Interior, since they were the final decision maker, to have some oversight of these individual agencies. They developed a team, the Federal Law Enforcement Retirement Team, I think FLIRP is the acronym, to actually then be the overseer of who gets secondary coverage. During a routine audit of records in the late 2003 timeframe that Bureau of Land Management was undergoing, they noticed that, you know what, this might not be correct. And then they decided to seek from the Department of Interior an opinion who sent it to OPM. And that's where we are today. Okay. Thank you. Mr. James, you have two minutes. Thank you, Your Honor. I appreciate the time. I'm confident from the colloquy today the Court has a full appreciation for the case. I'd be happy to answer questions, but subject to that, I'd relinquish my time. Mr. James, the only question I ask is do you agree with Mr. Mickels' statement that we assess Ms. Wilson's determination under a Skidmore approach? That's perfectly acceptable to the petition, yes. Thank you, sir. We thank both counsel. We'll take the appeal under advisement.